THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* DANIEL LYONS, Appellant.

*Court of Appeals, June 5, 1888.*

1. *Criminal Law: Appeal.*—A failure to make an objection and take proper exception, deprives the defendant of his claim, as matter of right, to a reversal of the judgment.   But under the amendment of 1887 to section 528 of the Code of Criminal Procedure he can only ask that the court will determine upon the whole case the question whether justice requires a new trial or not, or whether the verdict is against the weight of evidence or against law.   In such case the court is vested with power, in its discretion, to disregard the neglect and review the case upon the merits.

2. *Same. Credibility of defendant.*—The fact that defendant was on trial for a capital offense, and his admissions of former arrests, convictions and imprisonments may be considered by the jury as bearing on his credibility as a witness.

3. *Same. Evidence.*—Evidence of the commencement of the history of

the relations existing between the defendant and the deceased which finally culminated in the shooting, is proper.

*Stephen P. Blake*, for appellant.

*Benj. F. Dos Passos*, assistant district attorney, for respondents.

PECKHAM, J.—This is an appeal from a judgment of conviction of the prisoner of murder in the first degree, in the court of general sessions for the county of New York. The prisoner was indicted for the murder of one Quinn in August, 1887, in the county of New York. He was tried in the general sessions before the recorder, and having been duly convicted and sentenced to death, his counsel appealed from such judgment to this court, under the act permitting such appeal, known as chapter 493 of the Laws of 1887.

It is claimed on the part of the defendant that the evidence does not show the defendant guilty of murder in the first degree ; and under the act of the legislature above mentioned, this court having the right to examine the record and determine upon the whole case whether the verdict was against the weight of evidence, or against law, or if justice requires a new trial, we are asked to make such examination in this case, and to reverse the judgment on the ground above mentioned.

The case being one in which the only judgment to be pronounced upon conviction under the indictment, is that of death, an appeal from such judgment makes it the duty of this court to examine with very great care and attention the whole record for the purpose of discharging the duty imposed upon us by the legislature and determining whether upon that evidence justice does require a new trial. In making that examination for the purpose of such a determination, the statute says it is not necessary that an exception shall have been taken to any decision made by the court below. Still, as has been already said by this court, a defendant under this statute cannot here claim as

matter of right the benefit of errors occurring on the trial, where no proper objection was made and no exception taken to the decision of the court below. Such failure to make an objection and take proper exception, deprives the defendant of his claim, as matter of right, to a reversal of the judgment. Under such circumstances he can only ask that the court will determine upon the whole case the question whether justice requires a new trial or not, or whether the verdict was against the weight of evidence or against law. The court is then vested with power, in its discretion, to disregard the neglect and review the case upon the merits. People *v.* Driscoll, 107 N. Y. 414; 12 N. Y. State Rep. 253.

Having the power, we have exercised it in this case, and have examined fully and carefully the whole record, and we are clearly of opinion that the verdict was not against the weight of evidence or against law, and that justice does not require a new trial. On the contrary, we are fully convinced that the defendant was treated with eminent fairness throughout the whole trial, and that the verdict is in accordance with law, and that a new trial should be denied. Not because we have any doubt upon the question, but simply because it is a capital case, we think it proper to state the facts which we think the jury would have been well justified by the evidence in finding in this case.

The defendant is a man between twenty-five and thirty years of age, a resident all his life of the city of New York. The deceased was also a resident of the same city, and had been all his life, and was a young man of rather above the ordinary height, and, as the evidence tended to show, something of an athlete. Some time in May, probably the 30th, 1887, the deceased, the prisoner and some others, including two or three young women, went to a picnic at the upper end of the island, at which there was dancing.

While there, there was some disturbance among this party, and something like the commencement of a quarrel between the deceased and the prisoner, the deceased de-

manding of the prisoner that he should apologize for some words which he had spoken of one Meehan who was a companion of the deceased. The defendant refused to do so and said that he would not take water from him even if he was a wrestler. The whole party were finally put out of the ground, and from that time until the 4th of July, there is no particular account of the relations existing between the prisoner and the deceased.

On the 4th of July the same parties met, either just prior to their going to a bathing place in the upper part of the town, or at such bathing place, and there they all had a bath. From the testimony of the women it would appear that all the women were drinking freely and the men of the party were partners in the same business. They wandered up and down through the town between the bathing place and Thirty-sixth, Thirty-eighth and Fortieth streets and Second avenue, going into various saloons and taking various drinks and loafing about until the evening of the same day. The party then separated for a short period. The same evening the deceased and the defendant again met in a saloon where the defendant and one of the women were drinking, and the deceased being on the outside sent some one in to the defendant and asked him to come out, which he did; and then, according to the evidence, Quinn took exception to something which he said the defendant had remarked in regard to his (Quinn's) conduct, and although the defendant denied having made the remark the deceased nevertheless assaulted him, first with his open hand and then with a bamboo cane which he carried, to such an extent as to quite severely cut his face, blacken his eye and cause the blood to flow freely down his face and over his clothing. The severity of this assault is variously described by the witnesses, some making it an exceedingly gross and desperate assault, others making it of a much less savage nature; but all agreeing that the defendant was assaulted and struck with the hand and cane of the deceased, and

that his eye was blackened and his face bloody from the effects of the assault.

It is agreed also that the defendant made no resistance to this attack, but endeavored to get out of the way of the deceased. After the assault was over the defendant met one of the girls and said to her " you were right after all, you had me done up by Quinn this afternoon." To which the girl replied: " I hope you don't think I had you done up." This was the same evening of the assault and a short time after it occurred. Evidence was given upon the trial that the defendant that same night made threats in regard to the deceased and said he would get " hunk " with him, and one witness testified that he said he would put a bullet in him the next time he saw him. Others testified he said, " he did me to-night but I'll do him the next time I see him," or " I'll do him to-morrow," or "he did me to-night and I'll do him when he has friends and I have mine."

The next day, July 5th, the defendant was not at work, but met a companion with whom he walked through the streets of the city, and they finally went to a saloon about 2 o'clock P. M., where the barkeeper was a brother of the companion with whom defendant was walking. Defendant asked him if he had a pistol, and the barkeeper seeing his brother who was behind the defendant, shake his head, told the defendant he had not, it was at home and broken. About this time another companion came into the saloon and asked the defendant where he got the shiner (meaning the black eye) and defendant told him that Quinn had given it to him the night before and threatened to do it every time he came around that corner (being the corner of Second avenue and Thirty-sixth street). and that he meant to be prepared for him. He then asked the witness if he had a pistol and was told that he had one at home. The defendant asked him to loan it to him, saying that he would give it back to him the next day, or some such ex-

pression as that. The witness then went to his home, got the pistol and came back, having been gone probably two hours. He found the defendant at the saloon when he came back and gave the pistol to him. At this time there was noticed on the defendant's chin a cut or scratch, described by the witness as not a very deep one, but at the bottom of the chin plainly visible and seemingly recent. When the defendant received the pistol from the witness he asked him if it was loaded and was told that it was not.

The witness on the stand swore distinctly and positively that the pistol was not loaded when he gave it to the defendant; that he examined it before handing it to the defendant and knew it was not loaded. This was in the afternoon, about 4 o'clock, of July 5th. As soon as the defendant received the pistol he went into the rear of the saloon behind a kind of partition and was there heard to "click" the pistol a number of times. When he came out he was accompanied by the same person who came with him when he first entered the saloon, and they walked down street together and parted at the corner of Thirty-sixth street and Fourth avenue about 4 o'clock in the afternoon. There was time and opportunity to load the pistol when defendant was behind the partition. Just before they parted defendant said to the witness that he meant to get "square," or "hunk," with the deceased. The witness told the defendant he had better not have any trouble with the deceased; that he was a bigger man than he was; that he had better take the black eye and have no more trouble, for he was known to be a pretty strong man. In the course of this conversation defendant told witness that Quinn had theatened to do him up every time he got him on the corner of Thirty-eighth street and Second avenue.

About twenty minutes or a quarter of five that same afternoon the defendant was seen on the southeast corner of Thirty-eighth street and Second avenue, and to walk

across that avenue to the other or west side, where he stood a few moments looking towards Thirty-seventh street. Then he was seen to walk back to the east side of the avenue, where the witness lost sight of him, as she was going into a baker's shop near by; and within a very brief time after that the shooting took place on the corner of ·Thirty-eighth street and Second avenue, on the east side of the avenue.

The defendant's home was in First avenue, and could have been reached by him by going through any of the streets south of Thirty-eighth or Thirty-ninth streets, just as well as through Thirty-ninth street.

There is no evidence by any one who heard the conversation that took place between the parties as the time of the shooting. Some of the witnesses were near enough to hear that it was an animated conversation, but could not detect the words.

The evidence of one witness was to the effect that he saw a person who turned out to be the defendant, raise his hand to fire at the deceased, who almost immediately fell, and the defendant then turned and walked, and subsequently ran away. The person who was talking with the deceased on the corner of Thirty-eighth street and Second avenue just before the defendant came up said that the deceased was standing with his back towards the south, or the direction from which the defendant was coming up Second avenue; that they were talking about the assault deceased had made upon the defendant the night before; that as witness was facing the deceased he saw the defendant coming up the avenue between Thirty-seventh and Thirty-eighth streets, and when the defendant was near or about to cross Thirty-eighth street he said to the deceased, " here comes Lyon now ; " that immediately deceased turned in the direction the defendant was coming and moved towards the curbstone, the effect of which was to put himself in front of the defendant and to intercept his progress.

Then there was, as has been stated, animated conversation followed by the shooting, and without any assault having been seen to have been made by the deceased upon the defendant.

The defendant, as is stated, ran away and went to New Jersey and also to Pittsburg, and was finally arrested there on the 21st of July and brought back and lodged in jail in New York.

This evidence was substantially uncontradicted, except that the defendant was put upon the stand and claimed that the killing was done, first, in self-defense; second, that it was accidental. He testified that he did not believe the pistol was loaded when it was given to him by his friend, who stated to him that it was not loaded, and that he did not himself load it after he got it; that when he met the deceased he was on his way home, and endeavored to go by without meeting him, but that when his presence was discovered by the deceased and when he stepped forward and intercepted the defendant, some conversation occurred of a threatening nature, and the deceased then assaulted him and cut his chin with a dagger or some sharp instrument and was proceeding to further assault him when he called out to him to stop, that he was armed, and for the purpose of frightening the deceased, he drew the pistol and pointed it and fired, not supposing that it was loaded and with no intention of injuring the deceased; that he almost fainted as soon as he saw what he had done, and then started and ran away.

Various other contradictions of the testimony produced by the people were given by the defendant, and one witness was called by him who testified that after the affray or quarrel he saw the defendant walking away with his pocket handkerchief placed up against his chin which was bleeding. This evidence the defendant claims was corroborative of his own testimony in regard to the assault having been made by the deceased upon him at the time of the shooting. From

all the evidence in the case, carefully considered, it would seem quite plain that the defendant, instead of seeking his home, was engaged in watching the place where the deceased was accustomed to be, and was crossing the avenue from one side to the other, with the evident purpose of awaiting the arrival of the deceased; and when he appeared, the defendant, with the pistol in his pocket, started up the avenue with the intention of meeting him. The evidence made it plainly a case for the jury to determine as to the intention of the defendant in putting the pistol in his pocket and starting out for the vicinity where the deceased was accustomed to be. The careful examination which we have given the whole evidence in the case, leads us to regard the verdict with entire satisfaction.

Aside from the fact that the defendant was on trial for a capital offense, which the jury might consider in weighing his evidence, the further facts appeared upon his examination which the jury might also consider as bearing upon his credibility, that the defendant had been arrested when seventeen or eighteen years of age, for an attempt to commit burglary, had pleaded guilty, and been sent to the Elmira Reformatory, where he spent some years; that in 1884, he was convicted of an attempt at burglary, and sent to state prison; that he had been arrested numerous times for disorderly conduct; and during his flight after the killing in question, he was arrested in Pittsburg for an attempt at burglary, and was in jail in that city when the officers from New York arrived and identified him.

The great weight of evidence upon the trial was with the people. There can be little doubt that the defendant, smarting under the beating which he had received the night previous, procured the pistol and started out in search of the deceased, with the intention of taking the law into his own hands, and wiping out the insult by the destruction of the person who had been the cause of it.

Some exceptions were taken during the course of the trial which it is proper we should notice.

Counsel for the defendant argues that the testimony given in regard to what took place at the picnic, three or four weeks prior to the shooting was improper, and should have been excluded. We think not. It was the commencement of the history of the relations existing between the defendant and the deceased which finally culminated in the shooting on the fifth of July. A quarrel between the two men began at the picnic, and being so short a time before the shooting it was proper to show it.

Counsel for the defendant made several requests of the court to charge the jury, and it would seem that the court substantially complied with them. There are no exceptions to any alleged refusals of the court to charge and there are no exceptions to the charge as made.

It is claimed, however, that the learned recorder erroneously instructed the jury in regard to the right of the defendant to arm himself, and that a new trial ought to be granted on that account. It is claimed he in substance charged that the defendant would have no right after the deceased had threatened him to come to the place where the deceased might be or to walk the streets in its vicinity; but that defendant's duty was to apply to the authorities and obtain the protection of the law. The difficulty with this is that the recorder gave no such charge. He did not state that an individual threatened by another with personal injury had no right to walk the streets or to go where the party making the threats might be; but that he must avoid meeting him or going through the streets where he might be and must call upon the law for his protection.

The learned recorder in his charge, when stating what might be regarded as excusable homicide stated that " if the pistol was fired by the defendant intentionally, if he presented it against the person of the deceased intending to inflict injury upon him, then it is manifest it was not an accident, it was not a misfortune within the meaning of the law, and therefore it was not excusable. And even if

it was by accident and misfortune, you must be further satisfied before you can acquit on the ground that the homicide was excusable, that the prisoner was engaged at that time in doing a "lawful act by lawful means and with ordinary caution and without any unlawful intent." The recorder further stated in regard to the assault on the 4th of July that "if any wrong had been done to him, if he had been assaulted as he claims he was upon that occasion and unjustly beaten and ill used, it was his duty to apply to the public authorities, to resort to the law for redress if he had an opportunity to do so, but he would have no right to arm himself and to go to the place where he expected to meet the man who had wronged and ill-treated him and inflict any bodily injury whatever upon him. That would be vengeance, and it is not doing a lawful act in a lawful manner."

Counsel for the defendant further argues that this charge holds the defendant guilty, if defendant had unexpectedly and without seeking the deceased met him, even if the pistol at the time had been accidentally discharged. No such construction can be given to it, and that was not the idea expressed. No fault can be found with the law as really laid down by the learned judge. The clear meaning was that no man can for any affront or insult that has been perpetrated upon him hours before arm himself with a deadly weapon and seek out the individual who committed the offense and then and there proceed to take the law into his own hands and punish the perpetrator of the wrong. And if while intent on such purpose he meets the individual upon whom he designs to wreak his vengeance, and before he is ready to fire the shot, and while the intent still exists, the pistol is accidentally discharged and his enemy killed, it cannot be said for one moment that the defendant was then engaged in doing "a lawful act by lawful means and with ordinary caution and without any unlawful intent," and that therefore the homicide was excusable.

The whole charge of the learned recorder was an exceedingly fair one. Every right of the defendant was carefully guarded, the law was accurately explained, and the question to be decided by the jury was presented to it in clear, careful and able manner.

We are satisfied that no exception taken by the defendant upon the trial is of any force, and we think the judgment entered upon the verdict should be affirmed.

All concur.